Good morning. We have three argued cases today. The first of these is No. 13-1545, Abbevie Inc. v. Kennedy Inst. of Rheumatology. May it please the Court. The treatment method claimed in Kennedy's 442 patent is a patentably distinct species of the generic method claimed in the 766 patent. Therefore, the District Court erred in declaring the second patent invalid under the ODP doctrine. We know, Your Honor. Does that suggest you're giving up on the statutory argument after Gilead? We're not giving up, Your Honor, but we would submit that on the briefs. We understand that that issue is purely one of law. It's fully in there. We believe in it. It's academic, of course, if the Court agrees with our principal argument that the District Court erred here. If there is no ODP, then the Court doesn't have to answer that question. If the Court were to affirm on the ODP ground, it would have to answer that question, and then we would preserve it both for this panel and for rehearing and so forth if necessary. But today, I'd like to focus, unless the Court has questions, on the Court's error in applying the ODP analysis as it has traditionally been understood by this Court. In that respect, it is very important to note that the only question is whether the claims of the second patent are obvious in light of the claims of the first patent. That has been held over and over again in the ODP cases. We know that the 442 patent is novel. We know that it's not obvious over the prior art. We know that it claims a different invention. We know that there was no misconduct during prosecution. My friend, Mr. Morin, and his colleagues did not raise any statutory challenges or an inexplicable conduct challenge. The only objection to their continued payment of royalties under this patent... Regarding claim construction of active disease, you invoked the lexicography rule, but as Abby points out, there seem to be two definitions set out in the specification. The one you propose and the other according to the criteria of the American College of Rheumatology. To address that... Yes, Your Honor. First, that's an argument that Abby didn't make in the lower court. It's the first time in this court. Second, the American College of Rheumatology doesn't have a definition. If you look at the website, what it has is a series of criteria for diagnosing rheumatoid arthritis, which have changed over time. It does not have any definition of active disease, which was the question in this case. Any ambiguity there was completely resolved during the prosecution history. The examiner initially rejected the 442 application for indefiniteness on this term, that the term active disease was not defined in the specification. And at page A5997, the patentee specifically pointed the examiner to the definition in the patent, the active disease, the six swollen joints and so forth, and said that gives the term meaning. And the examiner then said, okay, and it's held in an interview, okay, then amend the claims to include the active disease as a limitation. That appears at A5996 to A6002. The claims were amended specifically to include active disease as defined in the prosecution history. If you want to look at a disclaimer, if you will, Your Honor, if this were an infringement case, the patentee defined active disease in that very specific way. The examiner accepted that and then recited it in the reasons for allowance, A6007, and also as the grounds for overcoming the rejection at A6112. The examiner specifically relied on that definition of active disease to allow the 442 claim. So that was the series of events in the prosecution history, none of which my friends have challenged, none of which they've even referred to, nor did the district court. Instead, what Abbott did at trial was put on its expert to say, well, that's a perfectly good definition for clinical trials, but it's not a definition that a treating physician would use in the examination room if a patient were sitting in the chair, which may or may not be true. It doesn't matter. In fact, that ACR reference that's in their footnote shows that there are many diagnostic criteria for rheumatoid arthritis, not for active disease. What was the question in this case? The question of claim construction is, what does active disease mean? And in that respect, it's in the specification, it's in the prosecution history, and it's recited as a limitation in the claims. And there, the district court made an absolute error of law in applying a different construction supported only by expert testimony that has no connection to the specification of the prosecution. Mr. Perry, wouldn't you agree that there are stronger examples of lexicography by your patent owner and the patent for other terms such as therapeutically effective amount and TNF-mediated diseases, transplantation, etc.? In those examples, the spec specifically says, as used herein, a therapeutically effective amount is such that dot, dot, dot. Yes, Your Honor. And so when you set up a definition with a phrase like as used herein, that to me is a much stronger indicia of some attempt at lexicography than what we have here, which seems to be at least the way it's used in the spec, more in the context of how that term was used for purposes of doing a clinical trial. Your Honor, in the specification, it sets forth the definition of active disease that was used for the patient population that was studied, for example, one, the T14 trial, which of course is the data set on which the later claims, the 442 claims, are premised, so that it is the definition used to generate the data on which the 442 claims were premised. Your question echoes the examiner's initial objection. What the examiner said is, yes, it recites a clinical trial definition, but is that really the definition for the claims? And that's where, as I said, at page A5997, the patentee came back and said, yes, that is the definition that we are using for this new application, the 442 application, specifically to defer to this new treatment method, the 442 treatment method. And that's when the examiner responded, okay, then you need to recite it in the claims. And the claims were amended to include active disease as defined in that exchange with the examiner, which is very clear in the prosecution history. The specification was not amended because the specification was part of the application. I don't have it in front of me right now. Do you have something in the record that really makes clear that the examiner believes that it is, he is, or she is, granting your 442 patent because active disease means all of these very particular properties or conditions? Yes, Your Honor. To be clear. If I could walk through the record on this point, because it's very important. The examiner rejected claims initially for indefinite. The patentee came back and said it is definite because of the that is an A59. Which volume? I'm sorry, Your Honor. It's in Volume 3 of the appendix. Your Honor, it's at A5957, if we could start there. In response to the examiner's assertion that the term active disease is indefinite, applicants direct the examiner's attention to the specification and not to the patent. Which states that, and then it has a block quote of the very definition of active disease that we are contending here. This definition of active disease applies to individuals suffering from rheumatoid arthritis, whether they are being treated or not, and whether there is an improved response to treatment or not. That is at A595A. Accordingly, applicants maintain, and so on, that it overcomes the indefinite rejection. There is then recited, Your Honor, a summary of the examiner's interview with the applicants following this submission in which the examiner. Where is your page, please? Your Honor, it's at A6002, which summarizes the telephone conference at which the applicants submitted their claims. The preceding pages include especially A5997 and 5998, which show that all of the claims now at issue, including Claim 2, were amended to include active disease as a claim limitation. My problem, Mr. Perry, is what difference does this make? Let's suppose that you're correct as to both of your claim construction contentions, but let's assume also that we can look at the specification of the 766 patent to determine the scope of the claims there. Why isn't it clear that the 442 is directed to the very heart of the invention which is claimed in the 766 patent? Two answers, Your Honor. First, the 766 specification is not prior art to these inventors. It can't be looked at as... No, but I'm asking, you're not accepting my hypothetical. I'm saying let's assume we reject that and we say we can look at the specification. How can you possibly prevail if that's the case? Your Honor, if the court were to overturn every ODP case ever decided, including Gilead and Eli Lilly, and say that you could look at a specification in an ODP case, then I agree that we would have a problem. But that's the error that the district court committed. That is not permitted in the ODP. That's a difference between ODP and 103. The case that permits you to look at the specification to determine the scope of the claims. I don't agree with that, Your Honor. The specification may only be consulted to determine the meaning of claim terms. The claims themselves, the reference patent, can only be asserted as to its claims. How is that different? How is it different to look at the specification to determine the scope of the claims and determine the meaning of the claims? Well, Your Honor, let me use active disease as an example. The term active disease is not used in the 766 claims. The 766 claims are a generic method that applies to every person with rheumatoid arthritis in need of treatment, which is every person with rheumatoid arthritis. The 442 patent is a very specific subset of patients, those who have active disease, defined as six or more swollen joints in the two secondary criteria, and who are failing treatment on methotrexate, the gold standard of treatment at the time. It is a subset of the patients claimed in 766. It is, in that respect as others, it is a species of the genus. That is the difference between the two patents. The reason that the District Court, by rejecting the proper construction of active disease, construed the 442 claims in this element as being coterminous with the 766 claims. And if they are coterminous, of course they're obvious. But they're not coterminous. They have an additional limitation added during prosecution at the examiner's institution. How many species were in the broader genus covered by the 766? There's no evidence on that, Your Honor, and Abbott only wants to focus on one, the mode of administration. There's a different patient population. There's a different treatment history. There's a different mode of administration. There's a different mechanism of action. There's a different dosage, and there are different clinical results. And if I could focus on that last one, because it's absolutely critical. The 766 patent claims, generally, for everybody who has RA, if you give them methotrexate and one of these antibodies in combination, then they will get a therapeutically effective amount, a therapeutic benefit, which is defined as something you can test by a lab, a reduction, for example, in C-reactive protein. The patient doesn't have to feel better. The doctor doesn't have to see anything change. The 442 claims in this very specific patient population, those who are failing on methotrexate, for whom it would have been totally counterintuitive to keep them on methotrexate, by the way, this is not just a clinical therapy. I'm sorry, I'm really not We're dealing with patient populations who had been receiving methotrexate, and they were going to add the antibody, and it had desirable results. How is that different from what's being claimed in the 442? Because the difference is the 442 has as a claim limitation that the therapy prescribed will have a substantial reduction in the signs and symptoms of rheumatoid arthritis. Signs and symptoms means the observable, not laboratory testable, the observable manifestations of this disease from the patient's and the doctor's perspective. The patients will get better. That is not claimed in 766, and that was not obvious from the 766 method. But the purpose of the 766 was to make them better. The studies supporting the patent showed that they did get better. What's the difference? The studies supporting the patent, which are not prior art to 442, showed therapeutic reductions in certain laboratory tests. What the 442 specific therapy, which has a specific dosage, separate compounds, and the special treatment regimen showed that in many of these patients achieved remission. Your Honor, this is an incurable disease. The best that can be hoped for is remission, and this new invention, novel and non-obvious invention, conceitedly, has the amazing result that these patients go into remission. That was totally unexpected. Their expert, Dr. Weinblatt, agreed that that was a totally unexpected result. So it is a species, Your Honor, that is not obvious. Claims are not limited to people who go into remission, is it? They are limited in the claims themselves to persons who have substantial reduction in the signs and symptoms. But not people who go into remission. That includes remission, Your Honor. 766 doesn't require any reduction in signs and symptoms, only a therapeutically effective amount. It's a dramatically different patient population with a dramatically different result. And you add up all these differences. What the district court said over and over again is that one is encompassed by the other. The encompassment doctrine is wrong, Your Honor. Judge Gould, if I have any remaining time, I'd like to reserve that for a moment. We'll give you two minutes. Thank you, Your Honor. Mr. Moore, may it please the Court, Your Honor? In a little unconventional way, I'd like to start with active disease, but start with why the meaning doesn't matter to answer your question first, and then I'm going to explain why the construction of the district court was correct. And here's why it doesn't matter. To get the first patent, the 766 patent, allowed in the first place, when it was under rejection, Kennedy told the patent office that the patient population did not matter. That the 766 method was applicable and got the same results across all patient populations. The question of active disease is just a matter of what the patient population is. Those patients with active disease. But they have already answered the question, and they got their first patent based on the premise that that patent is equally applicable, and you get the same results across the entire patient population. The only way you even get through the gate, the only way you can start looking at their other arguments, is if you allow Kennedy now, after it got one patent based on the premise that the patient population is equal, to allow Kennedy now, after they got 100 million in royalties and after that patent expired, to have another patent that's based on the exact opposite premise, which is all that my friend was talking about during his argument. But there's more evidence than that, that the definition of active disease does not matter. And by the way, we've heard talk about whether or not there's been waiver on some aspects of the active disease question. There's a reason there's not more evidence in the record below, is that we didn't think it was really a significant dispute. Their expert, in a four day trial, had one question and one answer on the definition of active disease. And all we thought that we were arguing about, because of their construction, was whether or not you define it qualitatively, reducing signs and symptoms, or quantitatively, here are the signs and symptoms in terms of swollen joints. But if I could ask... Is there any evidence in the record that if you use their definition of active disease, that there are unexpected benefits? No, your honor. There's two reasons that there's no evidence in the record. The first is, is that I think that their statement to get the patent allowed in the first place in 766 foreclosed that argument. This court has held time and again that applicants are held to the arguments that they make in order to get their patents allowed. They've gotten that patent allowed and it forecloses it. Number two, the district court's factual findings after weighing all the evidence in the expert testimony are reviewed for clear error. And the court specifically found in his findings that that was not unexpected. And he based that on the record evidence. What was the record evidence by that point in time? It's that combination therapy by 1996, their new priority date, was well known and used. There's no dispute on that. People added other drugs to methotrexate. The Schwederman and Higgins references that don't even appear in their blue brief taught to do exactly that. The FDA says in Schwederman it was telling people to do exactly that. But if I could direct, your honor, if I may, to the point in which we know that the definition does not matter, if we could go to the appendix, appendix volume 1 at A1596, please. And this is their expert Mr. Lipsky's one, Dr. Lipsky's one answer on the definition of active disease and why we didn't think it was an issue below. Why this is all an issue that's dreamt up by good appellate counsels trying to make a mountain out of a molehill. And if you go to page A1596 and if you go to line 16 through 18, he's saying what his definition is. Now keep in mind if we step back for one second, that there's no dispute that the ordinary meaning of active disease is signs and symptoms. That's the ordinary meaning. Now he's saying I'm going to quantify it for us and at line 16 through 18 he says it closely, closely reflects the kind of activity that would cause a patient to think about changing therapy. And what he's saying there is this. I am quantifying the type of disease that people would have to add an antibody in the first place. It means there's no difference between his definition for the 442 patent. He says I'm quantifying why people would use an antibody, add an antibody. There's no difference between that and the patent they already had and which expired, which goes to co-administration in the first place. On top of that. I'm not fond. Why does it matter what the witness thought the claim meant? The question is based on the language and the specification of the prosecution history, how do we construe it? And they have pointed to something in the prosecution history which suggests that they were urging on the examiner the definition that they're now urging. So tell us why that's wrong. Okay. Two answers to your question, Judge Dyke. My first answer when I pointed to his definition is just showing that under their definition, it's the same result. It's pointing to the same patient. He's just quantifying what's qualitatively defined by the court, which is you have signs and symptoms. But as to why the district court's definition was right in the first place, you'll notice we talk about waiver, that they never pointed to that prosecution history in the district court. And they never pointed to it in their blue brief. Only in their reply brief. I must say, sometimes you're both arguing waiver. Just put the waiver aside. We're not going to ignore some piece of prosecution history just because it's mentioned for the first time. If the same issue is involved, we've had a number of cases about that. I understand it, but my point here is this, Your Honor, is that there's a reason that it didn't come up beforehand and they didn't rely on it beforehand. It's because they know that other portions of the prosecution history point to the other definition. So they end up with two definitions as well. At A5748, for example, when they introduce the term active disease into the claims for the first time and they give the 112 support for it, they point to the ACR lines. The ACR definition. They say it's not a definition. I don't even understand that argument. It says, as determined by those criteria. But if you go to A5748, which is in Volume 3, what you will find is that when they introduce Claim 60, which adds active disease, they point to the specification at line 28, page 28, lines 24 through 26. And if you go back to that specification at A5691, you'll find that they're pointing to the ACR definition. So they point to both definitions. The same thing holds true later on during the file history when they add Claim 41 at 5866. For the record, 5866. They're adding active disease there. They point to page 28, lines 23 to 26. They point to the ACR definition. One minor point, by the way. Our friends take us to task a little bit for pointing to the internet for the definition of ACR, active disease. I just make the Here's what you have in the end of the day on active disease. You have in terms of the definitions, as Judge Chen pointed out, it was going to be my first point, actually. When they wanted to define a term in lexicography as you're required to do or you're supposed to do, they made it clear. They said, as used herein, those are the definitions. They did not do that on active disease. When we get to a clinical trial, which everyone agrees that the claims are not limited to a clinical trial, they point to one of two definitions. The court is clear, for example, in the Abbott case, that if there are two definitions, even if you were to accept that portion of the specification, it's not lexicography. The last thing they hinge it on, to try to change what everyone agrees is the ordinary meaning, and to try to limit this claim to one of clinical trials rather than patients, doctors who see signs and symptoms, is one shred of prosecution history that had never been mentioned before in the case. As I've shown you, even that is inconclusive and ambiguous, because other portions of the prosecution history stand for the exact opposite proposition. But the key point of this is that we're arguing about things that don't matter. They've already said to the patent office to get their first patent allowed that there is no difference, that it applies equally to the patient populations. Professor Maney has already said that the first patent, in terms of adding an antibody, was already about the sickest patients that he talks about. No difference in populations. Their expert, Professor Lipsky, Dr. Lipsky, goes so far as to say... Suppose that someone discovered later on that there was a difference in the population. It might be a slightly different story, although I would still say you should hold them to their binding statement. Is there any evidence here that there was a difference in the population? No. No, there's no evidence that there was a difference in the population. Why does it matter? It shouldn't matter is my main key point, that what they said to the patent office is absolutely correct, because in terms of what's actually co-administration, properly defined, there is no difference. But the key point is this, is that what we seem to be hearing is that once you get one patent on co-administering to treat people who need it, that all of a sudden, because they can draw a line and say there's a difference under their assertion, that the second patent is about treating people who need it who are sick, that doesn't make any sense. They've already got one patent on treating people who need it. Getting a second patent on treating sick people who need it doesn't make any sense. Especially when their expert, Dr. Lipsky, admitted that only 15% of the population is in remission. If you let them get away with this argument, they would be getting away with getting one patent on treating people who need it, and then getting a second patent by saying this time we're going to treat the 85% of the people who really need it. The record evidence doesn't support it, and by the way, all the underlying facts are reviewed for clearer. This was a four-day trial with expert testimony by both sides, at the conclusion of which he credited one over the other, and wrote on his own, we didn't even put in post-trial briefs, a 107-page opinion setting forth all of this in detail. Mr. Morin, I don't know this. I mean, the FDA lets you take things off the book, so to speak, and use them for other purposes. But would they allow a therapy that was not useful? I wouldn't think that they would. They don't allow it, and one of the criteria has got to be safe and effective. And effective. Right. And as far as the remission point, it's just a red herring. This is clever appellate counsel, good appellate counsel, trying to say, how can I show a difference between these claims? And what he's saying now is in one set of claims, you could theoretically treat people in remission. That's not a test for obviousness, Your Honor. If I say it would be... But they admitted that their claims in the 442 are not limited to people in remission. That's right. But I think their point is that the 442 is limited to the really sick patients, and the 766 could go to patients who weren't sick also, theoretically. And they say like people in remission. But of course, the evidence shows that the people who were being treated in the 442 were the most likely people to be treated. My friend has admitted that methotrexate was the gold standard. So these were the patients who were already on methotrexate in the first place. Just because I might say that there's another way for me to get to the fourth floor to the third floor, throw a rope out the window, and go that way. Just because I can come up with a difference doesn't mean it's not obvious to take the stairs to the elevator. That's a situation we have. They hear. On appeal, they're trying to go back, and they're trying to manufacture a difference between the two claims in any way they can to try to get a remand. And as I hope I've shown with respect to active disease, and what's also true with respect to co-administration, is that even if you can theoretically come up with some difference between the claims, all of the evidence of trial, including from their inventor, including from the experts, showed that the most obvious way to co-administer was to do exactly this. By then, Schwederman, the FDA, was telling people to do that. By then, Higgins was disclosing that companies were doing that. By then, it's undisputed that people were adding an antibody on top of methotrexate therapy. All of these things are heavily supported in the evidence and are reviewed for clear error. Now, please. I thought they were saying this particular species of co-administration yielded unexpected results, and that's how they were able to convince the examiner to grant them the second patent. That's their argument, Your Honor. I think their argument on co-administration, to turn to that, is it gets a little bit difficult to follow, in my opinion. But I think their argument is that there's another type of co-administration, which is what the patent calls the antibody alone group. Their argument is that's another type of co-administration. And you step back and you say, why do they need that? Well, they need that because they need another type of co-administration so that they can try to show that the adjunctive is superior to that. If they don't have that, I think everyone agrees on our construction, they have no unexpected results, because there's nothing to compare it to. So they need to fabricate an additional category of co-administration in order to get that done. Now, they have multiple problems with that. The first of which is back to the prosecution history, where they told the patent office to get the first patent allowed, not only that the patient population doesn't matter, but that the mode of administration doesn't matter either. So again, to get that argument off the ground, you would have to accept them reneging on exactly what they said to get their first patent allowed in the first place. But moreover, the whole argument about whether or not that antibody alone group should be considered a type of co-administration doesn't get off the ground in the first place. If you look at the specification and you look at column two, it calls that group an antagonist administered alone. It doesn't just say antagonist alone. It says antagonist administered alone. There's no possible way that you can consistently say that that group is co-administration when the specification says it's the antagonist administered alone. And six times in prosecution of the 766 patent, they said that is not our invention. Six times they said, look at the combination group, the co-administration group, and how it is better than the antibody alone group. If you were to allow their co-administration argument to get off the ground, you would have to ignore the six times that they distinguished those things. And that is not impermissibly looking at the prosecution history like my friend asserts. That is exactly what you're supposed to do in claim construction and look at how they define the terms of the 766 patent. They clearly define it as not including that group. What's your understanding of the law on obviousness type double patenting in terms of consulting the specification in terms of doing the overall inquiry? And let me throw in with that, don't you want to say something nice about Gilead? Oh, it's a good decision. One other thing. Let me. Good. Good. I'm not pandering, Your Honor, but it came at a convenient time since the crux of their brief was that the court has not yet invalidated an issued patent. One quick word on Gilead if you'd like it. Their only other argument that they rely on after Gilead really is the 282 argument. The court disposed of that in quantum by saying it lists defenses, but not the only defenses, that it's an open list. If you didn't have that, all sorts of other defenses, forfeiture and all sorts of other defenses wouldn't exist. But getting to the crux of the issue here, their only two issues on appeal end up not mattering at all because they're based on the mode of administration and they're based on the patient population. And if you allow them to get the new patent on that, on those distinctions, then you're unwinding all of history and you're allowing them to have one patent on one premise and one on the other. In terms of the use of the prosecution history and the specification, there's one thing everyone can agree on, and that's black letter law, is that you're at least allowed to rely on the specification and the prosecution history to interpret the claims, which is, I think, what we've done. We're, of course, holding them to their binding statements to the patent office, but that is not using it as prior art. That's using the admissions of the other side and actually the estoppel principles of this court among all sorts of other principles such as considering the scope of those claims. They said that the results were commensurate with the scope of their claims. Having said that, they can't now unwind it and act as if they hadn't said it. And I will tell you, in the three years of this case, that's one thing they've never had an answer to or response to, which is that they've directly contradicted what they said to get the first patent allowed to get the second one allowed. That, I submit, they cannot do, and we'd ask the court to affirm the district court's decision. Okay. Thank you, Mr. Miller. Thank you. Mr. Perry, what does the record show, in your view, as to unexpected results for this very sick population that you say is covered by the 442 patent? Yes, Your Honor. First, the examiner may express finding an unexpected result. That's page A697. And I'm not asking what the examiner finds. I'm asking what the evidence says. Yes, Your Honor. There is unexpected results of remission. That is shown in our brief at page 56. And Abbott's expert, Dr. Weinblatt, agreed with this. It's at page A1322. What's the source of that evidence? That was the T14 study that's described in Example 1 of the patent, Your Honor. A1322, 1324-26, and 1672-73, Dr. Weinblatt agreed that these results were unexpected. But your problem is that the claims aren't limited to people in remission. So what is the evidence of unexpected results as to the claims scope? Your Honor, the claims are limited to significant reduction in signs and symptoms, which includes remission. And, of course, the unexpected results don't have to be claimed. But unexpected results don't have to be claimed. If you accept my proposition, what is it with respect to the scope of the claims, the full scope of the claims in the 442 patent that shows unexpected results? The MTX plus arm of the T14 study, as described in Example 1 of the specification, shows the unexpected benefit over the MTX minus arm. This is the debate between adjunctive versus sequential co-administration. And this is remission? No, Your Honor. That is substantial reduction in signs and symptoms, which is claimed, and that is what the examiner expressly relied on. My friend's only objection is not to the data. It's different because they're observable symptoms? Versus laboratory tests. That's correct, Your Honor. And the district court and my friends read that out because they say that co-administration doesn't include sequential, so we're just going to ignore the MTX minus arm of the study. That doesn't make sense, and the examiner didn't agree with that. We've explained all that. Again, I appreciate Mr. Morin's comments on appellate counsel, but I'm just supporting the examiner here. The examiner made express findings that we have a limited patient population and a point that's in the claims that was never addressed. In fact, the claims at all, I'd like to remind the brief that on page 31 of our brief, there's this claim chart that shows all the different limitations between the claims, which haven't been discussed here today. The 442 patent method is directed to those patients who are failing on methotrexate. This is a very toxic chemotherapy drug, Your Honor, and it's not doing any good for this specific patient population. And what this inventive method says, if you do this particular dosing of one two-step with these measurements and keep them on methotrexate, which itself would have been counterintuitive, which is what the experts testified to, Your Honor, that was an unexpected result. That it had any effect at all, let alone the surprising effect here, and the examiner expressly relied on that, a combination of the unique patient population failing on methotrexate. It's not just that they're sick patients. They're the sick patients for whom the gold standard is not working. What would you say is your best argument on patentability? Is it the patient population? Is it the meaning of co-administration? Which one is it? It's the claim as a whole, Your Honor, which is, of course, the combination. The errors in active disease, the claim construction, but if we add together the patient population plus the clinical result, which is really what the examiner relied on at page A6007, that shows that the species as opposed to the genus. In other words, this is an improvement patent. ODP is not a junior varsity inequitable conduct claim. We've made no inconsistent statements. The first patent was issued on the ground that for all persons with RA, the combination treatment would achieve some benefit. That's absolutely true and has improved the lives of millions of patients.  Second, the 442 patent claims an improvement. It says for patients for whom methotrexate doesn't work, you can have this specialized therapy, and they not only will have a therapeutic benefit, that is a laboratory benefit, a reduction in CRP or something, but an actual reduction in signs and symptoms. Their joints will unswell. They will get out of the wheelchairs and walk. It was surprising that there was an observable benefit after the laboratory test said there was a benefit. Your Honor, absolutely right, because compared to the other treatments. Why was it surprising that it was observable? Because these are the patients that were failing already. They were not responding to methotrexate. Answering the question, why is it surprising that it would be an observable benefit? Because, Your Honor, the therapeutically effective amount previously claimed included many laboratory tests, which so many of these were studied. It was surprising to all of the researchers, and this is documented in the expert testimony and also in the submissions to the PTO, that the actual consequence. Where does it say that observable benefits are unexpected? Oh, Your Honor, it's the definition of signs and symptoms, which is undisputed. It's in our glossary at page 8592. I mean, this is an extraordinary claim limitation. The original patent had a functional claim limitation. It has to do some good. And this, Your Honor, I apologize, it's A5932 is the observable benefit definition. It's not the definition. It's the question of why is it surprising that there would be an observable benefit. Try again. The original patent claimed a therapeutic benefit, a laboratory testable benefit. For patients failing or who did not respond to methotrexate, it was not expected that they would have any benefit at all. What was actually learned during the clinical trials was not only did they have some benefit, but they had observable benefits. That is a reduction in signs and symptoms. And on that surprising result, that unexpected result, that thing that nobody expected in the scientific community, Your Honor, and again, there's no obviousness challenge here. There's no prior art that says anything like this. The patentee came to the patent office and said, this is new. This is surprising. And we will claim the result in the claim. It's a claim limitation that we have to have a reduction in signs and symptoms.  Thank you. Thank you, Your Honor.